952 So.2d 653 (2007)
Calvin RABALAIS and Merion Rabalais
v.
Lloyd A. NASH, Jr., et al.
No. 2006-C-0999.
Supreme Court of Louisiana.
March 9, 2007.
*655 Coughig Partners, Scott E. Mercer, James D. Prescott, III, Simoneaux, Carleton, Dunlap & Olinde, Henry D.H. Olinde, Jr., Baton Rouge, for Applicant.
Brian Caubarreaux and Associates, Brian M. Caubarreaux, Marksville, Derrick G. Earles, for Respondent.
JOHNSON, Justice.
This is a personal injury case involving an emergency vehicle that was returning to the scene of a fire. As a result of his injuries, Calvin and Merion Rabalais sued Lloyd A. Nash, the City of Marksville through the Marksville Fire Department, and the fire department's insurance carrier, American Alternative Insurance Corporation.[1] The trial jury found Mr. Rabalais *656 to be 100% at fault for the accident. Mr. Rabalis filed a timely Motion for Judgment Notwithstanding the Verdict and/or Motion for New trial. The trial court subsequently denied this combined motion. Rabalais appealed this ruling. The court of appeal affirmed in part and reversed in part the jury's finding. Rabalais v. Nash, Jr., et al., 05-0937(La.App.3Cir.3/29/06), 926 So.2d 683.
Defendants filed this writ of certiorari, which we granted, to determine the applicability of the Louisiana Emergency Vehicle Statute, LSA-R.S. 32:24(B). Rabalais v. Nash, Jr., et al., 06-0999(La.6/30/06) 933 So.2d 130. Under the circumstances, we find that LSA-R.S. 32:24, is applicable and that Nash's actions are covered by the statute.

FACTS AND PROCEDURAL HISTORY
On June 12, 2002, the Marksville Fire Department responded to a fire at the Jen-Re Plastics Plant, which is located on the west side of Highway One, or Tunica Drive, in Marksville, Louisiana. The fire was one of the largest in the history of Avoyelles Parish and because of the size and intensity, the fire department requested the assistance of seven neighboring fire departments from Mansura, Hesser, Bunkie, Fifth Ward, Moreuville, Brouilette and Pineville. There were reports that the smoke from the fire could be observed in Morganza, Louisiana, which is approximately 40 to 45 miles away, and that the smoke could be seen as far away as the LSU Campus in Alexandria, Louisiana. Because of this huge fire at the Jen-Re Plastics Plant, the traffic on Highway One, north bound, was mostly stopped or moving bumper to bumper.
Mr. Rabalais was attempting to make a left hand turn onto Highway One, which is at this point, a two lane north-south highway, with a turning lane in between the two lanes of traffic. Mr. Rabalais was leaving the parking lot of Glenn's Auto Repair Shop, which is located on the west side of Highway One, approximately one half-mile north of the Jen-Re Plastics Plant. Mr. Rabalais testified that he intended to travel north to Wal-Mart, which required crossing the southbound lane of traffic, the turning lane, and then turning left into the northbound lane of Highway One.
Mr. Earl Guillory, a motorist in the southbound lane of traffic, one of the named defendants herein, testified that he was stopped just before the driveway to Glenn's Auto Repair Shop, creating a gap in the line of stopped cars for Mr. Rabalais to pass through. According to Guillory, Mr. Rabalais was stopped at the end of the driveway, then he "shot right out in front of me" and "all I seen was a truck, zoom."
Because the traffic was so congested on the southbound lane of Highway One directly in front of the auto repair shop, Mr. Rabalais' vision of traffic in the turning lane was obscured by the line of stopped vehicles. According to Mr. Rabalais, Mr. Guillory signaled to him that it was okay to pull out of the driveway. Mr. Rabalais testified that at the time his vehicle was entering the turning lane he looked to his right in anticipation of his lefthand turn into the northbound lane of Highway One. He admitted that he never looked to his left to see whether any cars were coming from the left before he entered the turning lane.
Just as Mr. Rabalais was attempting to make his lefthand turn, defendant Nash, a Captain with the Marksville Fire Department, was traveling south in the center turning lane of Highway One, returning to the Jen-Re Plastics Plant fire in a Marksville Fire Department pick-up truck. The pickup truck driven by Nash was painted red, marked with the fire department *657 name and insignia, and had a bank of emergency lights on top of the cab. Nash testified that he had activated the truck's emergency lights and sirens. Gretchen Laborde and Lee Bordelon, two motorists stopped on Highway One, both testified to Nash's use of emergency lights and sirens. Firefighter Mark Bordelon was driving a fire engine pumper truck and was following behind Nash. Mr. Rabalais traveled directly into Nash's path in the center turning lane, where the vehicles collided. Mr. Rabalais was rendered unconscious and sustained serious injuries as a result of this collision.
The court of appeal affirmed in part, and reversed in part, the ruling of the trial court. The court of appeal reasoned that there were no facts or evidence in the record to support the jury's finding that the applicability of the Louisiana Emergency Vehicle Statute, LSA-R.S. 32:24, was appropriate. The court of appeal found manifest error, and after de novo review, reversed the decision of the trial court and allocated 50% fault to Nash and the Marksville Fire Department and 50% fault to Mr. Rabalais. Further, the court of appeal awarded the following damages: Mr. Rabalais $62,500.00 in general damages and $17,667.53 in past medical expenses, and to Mrs. Merion Rabalais $12,500.00 for loss of consortium.

LAW AND ANALYSIS
It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Blair v. Tynes, 621 So.2d 591, 601 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). To reverse a fact-finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La. 1987). Where the jury's findings are reasonable, in light of the record viewed in its entirety, the court of appeal may not reverse. Even where the court of appeal is convinced that it would have weighed the evidence differently to reach a different result, reversal of the trial court is improper unless the trial court's ruling is manifestly erroneous, or clearly wrong. Blair, supra.
The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one. See Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Where there are two permissible views of the evidence, the factfinder's choice cannot be manifestly erroneous or clearly wrong. Stobart, supra.
Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, where conflict exists in the testimony. Rosell, supra; Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, supra.
In Lenard v. Dilley, 01-1522(La.1/15/02), 805 So.2d 175, this Court *658 addressed the standard of care set forth in subsection D of Louisiana's emergency vehicle statute stating that:
LSA-R.S.32:24(D) sets out two standards of care for an emergency vehicle driver depending on the circumstances of the case. If, and only if, an emergency vehicle driver's actions fit into subsections A, B and C of LSA-R.S.32:24, will an emergency vehicle driver be held liable only for actions which constitute reckless disregard for the safety of others. On the other hand, if the emergency vehicle driver's conduct does not fit subsections A, B and C of LSA-R.S. 32:24, such driver's actions will be gauged by a standard of "due care."
The failure of "due care" is synonymous with ordinary negligence. "Reckless disregard," however, connotes conduct more severe than negligent behavior. "Reckless disregard" is, in effect, "gross negligence." Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110 and 93-3112(La. 7/5/94), 639 So.2d 216; State v. Vinzant, 200 La. 301, 7 So.2d 917 (La.1942). Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the of prudence, amounting to complete neglect of the rights of others." Hendry Corp. v. Aircraft Rescue Vessels, 113 F.Supp. 198 (E.D.La.1953) (applying Louisiana law). Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, § 34, at 211 (5th ed. 1984); 65 C.J.S. Negligence, § 8(4)(a), at 539-40 (1966 & Supp. 1993). "There is often no clear distinction between such [willful, wanton, or reckless] conduct and `gross' negligence, and the two have tended to merge and take on the same meaning." Falkowski v. Maurus, 637 So.2d 522 (La.App. 1st Cir.), writ denied, 629 So.2d 1176 (La.1993) (quoting Prosser & Keeton, supra, at 214). Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence. "Reckless disregard" or "gross negligence" is the standard to be applied if the emergency vehicle driver's actions fit LSA-R.S. 32:24(A) through LSA-R.S. 32:249(c). Otherwise, the standard is ordinary negligence. Lenard, supra.

THE APPLICABILITY OF LSA-R.S. 32:24
LSA-R.S. 32:24. Emergency vehicles; exceptions provides:
A. The driver of an authorized emergency vehicle, when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated.
B. The driver of an authorized emergency vehicle may:
(1) Park or stand, irrespective of the provisions of this Chapter;
(2) Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operation;
(3) Exceed the maximum speed limits so long as he does not endanger life or property;
(4) Disregard regulations governing the direction of movement or turning in specified directions.

*659 C. The exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of audible or visual signals sufficient to warn motorists of their approach, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.
D. The foregoing provisions shall not relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.
Defendants contend that the court of appeal erred in its interpretation of LSA-R.S. 32:24(B)(4), in that the statute allows emergency vehicles to disregard the regulations governing the direction of movement or turning in specified directions. Defendants contend there are no limitations or restrictions in the statute which would prevent defendant Nash's movement herein. They further aver that the court of appeal erred in limiting the statute to a situation where the emergency vehicle driver is driving the wrong way, down a one-way street. Defendants contend that the court of appeal's decision limits the protection afforded to emergency vehicle drivers and the actions they may take to respond to an emergency. Further, Defendants argue that in limiting the protection afforded to emergency vehicle drivers, the decision of the court of appeal exposes emergency service providers, both public and private, to a greater likelihood of civil liability. Defendants argue that subsection (B)(4), allows emergency vehicle drivers to move around stopped traffic by using the shoulders, turning lanes, or other means to reach the scene of an emergency, as long as the driver is making use of audible or visible signals sufficient to warn motorists of their approach.
Plaintiffs contend that LSA-R.S.32:24(A)(1) is not applicable to the facts of this case, because "defendant Nash was not driving a fire truck and he was driving in a center turning lane not designated for travel." In fact, the lane was marked as a "no passing" lane. They also argue that the fire was no longer an emergency. Plaintiffs contend that Nash's emergency lights and sirens were not sufficient to warn motorists of his impending approach, and he failed to exercise the proper standard of care. Rabalais contends that as a motorist, he had the right to assume that Nash and others would follow the traffic laws and regulations. Plaintiffs argue that the statute must be strictly construed, pursuant to the principal of stricti juris.
Subsection A(1) of LSA-R.S.32:24, sets forth the circumstances in which the driver of an emergency vehicle is granted particular driving privileges. Those circumstances are when the driver is:
(1) responding to an emergency call; (2) in the pursuit of an actual or suspected violator of the law; or (3) when responding to, but not upon returning from, a fire alarm.
Plaintiffs contend first that the statute is not applicable because the fire was no longer an emergency and Nash was not responding to, but instead returning from a fire. The record reflects that when the fire was initially discovered, the entire Marksville Fire Department rushed to the Jen-Re Plastics Plant. After arriving and fighting the fire for sometime, the Chief and the Assistant Chief of the Fire Department determined that the fire was out of control and that they needed additional assistance and equipment to fight the fire.
Ned Bordelon, the Retired Chief of the Marksville Fire Department testified via deposition, that due to the dangerous nature of this plastics fire, assistance was *660 requested from the Baton Rouge-Hazardous Materials ("HazMat") team which arrived on the scene of the fire and assisted the other fire departments in extinguishing the fire at the Jen-Re Plastics Plant. When they arrived, they contacted the HazMat team at the Exxon Plant in Baton Rouge and requested foam to help extinguish this chemical fire. The foam arrived in Marksville, approximately two hours after it was requested by the HazMat team.
Ned Boredelon testified that Chris Bordelon, Assistant Chief of the Marksville Fire Department ordered Nash and firefighter Mark Bordelon to return to the fire station in Marksville to pick up the Pumper No. 1 Fire Truck. He testified that he needed the second fire truck brought to the scene in case it was needed to help fight the fire at Jen-Re Plastics Plant.
On cross-examination, Assistant Chief Christopher Bordelon, testified he considered the fire an emergency and that it was a life or death situation for the firemen who battled the fire. Although the record is not clear as to exactly how long the fire was in progress when this collision occurred, what is clear from the photographs in evidence, is that smoke was still billowing approximately thirty (30)feet in the air at the time of this accident. Therefore, based on the uncontroverted testimony of the fire officials, we conclude that Nash was responding to an emergency when he traveled from the fire at the Jen-Re Plastics Plant to retrieve additional equipment to take to the fire scene.
Next, we address the issue of whether the pick-up truck driven by Nash was an emergency vehicle. We are guided by a review of the jurisprudence, where non-traditional vehicles have been held to be emergency vehicles. In Metoyer v. Benjamin, 00-1728(La. App. 3 Cir. 5/2/01), 784 So.2d 823, the appellate court held a wrecker, with its emergency lights flashing while responding to a traffic accident, is considered an emergency vehicle, and may not be held liable for an accident in which it is involved without finding that it exhibited a reckless disregard for the safety of others.
In Prather v. Gauthreaux, 297 So.2d 439 (La.App. 3rd Cir.1974), the appellate court held that the driver of wrecker with 4-way flasher and emergency beacon, who had been dispatched to the scene of an automobile accident and who had been instructed to get there as soon as possible was entitled to the benefit of LSA-32:24.
In both Metoyer and Prather, the courts held that wreckers were emergency vehicles. Considering non-traditional vehicles such as wreckers have been held to be emergency vehicle for the purposes of invoking the immunity provisions of LSA-R.S. 32:24, we must conclude that an official truck of the Marksville Fire Department qualifies as an emergency vehicle. Therefore, we conclude the fire pick-up truck qualifies as a emergency vehicle.
Subsection B of LSA-R.S.32:24, lists the privileges granted to an emergency vehicle driver. These privileges allow the driver to:
(1) Park or stand, irrespective of the provisions of Chapter 32 of the Louisiana Revised Statutes
(2) Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operation
(3) Exceed the maximum speed limits so long as he does not endanger life or property; and
(4) Disregard regulations governing the direction of movement or turning in specified directions. [Emphasis ours.]
*661 Subsection B(4) covers two types of maneuvers, those governing the direction of movement in specified directions, and those governing turning in specified directions. The court of appeal concluded that LSA-R.S.32:24(B)(4)only applied if the driver was (a) driving down the wrong way down a one way street, or (b) involved in a turn. The court of appeal concluded that since Nash's driving in the center turning lane was not specifically listed in LSA-32:24(B)(4), the statute was not applicable.
The court of appeal stated:
. . . [W]e find that Captain Nash's actions are not covered by LSA-R.S. 32:24. He was not parking or standing, nor was he proceeding past a red or stop signal at the time of the accident. He did not exceed the speed limit. He did not drive the wrong way down a one way street, nor did his actions involve turning. At the time of the collision, Captain Nash was driving down the center turn lane of a state highway, an exception not enumerated in LSA-R.S. 32:24. Because it must be strictly construed, the list of exceptions granted to drivers of authorized emergency automobiles is exclusive, not illustrative. See Pellegrini v. Crellin[2], 95-2654 (La.App. 4 Cir. 5/8/96), 674 So.2d 463, writ denied, 96-1592 (La.6/27/97), 696 So.2d 991. No where in the statute does it provide that the driver of an emergency vehicle may violate highway regulations and drive in the center turn lane. Therefore, Captain Nash's actions were not granted exception under LSA-R.S. 32:24, and the statute is inapplicable in this case. [Emphasis ours].
The initial point for the interpretation of any statute is the language of the law itself. Gregor v. Argenot Great Central Insurance Company, et al., 02-1138 (La.5/20/03) 851 So.2d 959; Ginn v. Woman's Hospital Foundation, Inc., 02-1913, p. 9(La.4/9/03),842 So.2d 338, 344; Rougeau v. Hyundai Motor America, 01-1182, p. 5(La.1/15/02),805 So.2d 147, 151. Special rules for interpreting a statute (such as LSA-R.S. 32:24) have been enacted by the legislative branch and are found in LSA-R.S. 1:1 et seq.
LSA-R.S. 1:3 provides, in pertinent part that, "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the language." LSA-R.S. 1:4 provided that "[w]hen the wording of a Section of a statute is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." The legislative branch also has provided general rules for interpreting laws in LSA-C.C. art. 9 et seq. See, in particular, LSA-C.C. arts. 9 and 11. We are bound by the language of a relevant law. Allen v. State through the Ernest N. Morial-New Orleans Exhibition Hall Authority, 02-1072, p. 12 (La.4/9/03), 842 So.2d 373, 381.
In Blair v. Tynes, supra., this Court held that the legislature has given law enforcement officers the exclusive power to regulate traffic and the public has a corresponding obligation to follow traffic regulations. Law enforcement officers *662 are duty bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm. When a law enforcement officer becomes aware of a dangerous traffic situation, he has the affirmative duty to see that motorists are not subjected to unreasonable risks of harm. Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672, 675 (La. App. 3rd. Cir.1991). In Mathieu v. Imperial Toy Corp., 94-0952 at 10,(La.11/30/94), 646 So.2d 318, this Court stated that the scope of an officer's duty is to choose a course of action which is reasonable under the circumstances. In other words, the scope of an officer's duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the "best" or even a "better" method or approach.
The Louisiana Constitution of 1974 art. III, § 15(A) provides, in pertinent part, that "[e]very bill shall contain a brief title indicative of its object." (Emphasis added.) Thus, the title of a law may be examined to determine its purpose. Boutte v. Jefferson Parish Hosp. Sev. Dist. No. 1, 99-2402, p. 5 (La.4/11/00), 759 So.2d 45, 49. When we interpret La. R.S. 32:24, we are bound to give effect to all parts of it and cannot give it an interpretation that makes any part of it superfluous or meaningless, if that result can be avoided. Palmer v. Louisiana State Board of Elementary and Secondary Education, 02-2043, p. 5 (La.4/9/03), 842 So.2d 363, 367; Hollingsworth v. City of Minden, 01-2658 (La.6/21/02), 828 So.2d 514, 517. The Title of LSA-R.S. 32:24, is "Emergency Vehicles; Exceptions."
After reviewing the title and substance of LSA-R.S. 32:24, we conclude that the purpose of this statute is to provide immunity from liability to drivers of emergency vehicles, under specific circumstances. When two or more interpretations may be given a law, the interpretation which is reasonable and practical is preferred to that which makes part of the law ridiculous or meaningless. Louisiana Horsemen's Association v. Fair Grounds Corporation, First Statewide Racing Company, Inc., d/b/a Evangeline Downs, Louisiana Downs, Inc., Delta Downs Racing Association, Inc., and the Louisiana Dept. of Public Safety and Corrections, 02-1928 (La.4/9/03), 845 So.2d 1039; Langley v. Petro Star Corp. of La., 01-0198, (La.6/29/01);792 So.2d 721.
In the instant case, "direction of movement" is not defined by LSA-R.S. 32:24(B)(4), and is the point of contention here. Dictionaries are a valuable source for determining the "common and approved usage" of words. Louisiana Horsemen's Assoc. v. Fair Grounds Corp., 02-1928, p. 5,845 So.2d 1039, 1042. In Merriam-Webster's Online Dictionary, the word "movement" is defined "as the act or process of moving; especially to a change of place or position or posture; a particular instance or manner of moving". The court of appeal concluded that the statute did not apply to Nash's driving in the center lane, since "driving in the center turn lane" was not specifically listed in LSA-R.S. 32:24. LSA-R.S.32:24 does not specifically list "driving the wrong way down a one-way street". Yet, in Carpenter v. Hartford Accident and Indemnity Co., 333 So.2d 296 (La.App.1st. Cir.1976), an appellate court held LSA-R.S. 32:24(B)(3) and (4) authorize the driver of an emergency vehicle to exceed the speed limits and to disregard regulations governing the direction of traffic flow. The police vehicle was traveling 60 mph, and the wrong way on a major city street.
The instant case does not involve a one way street nor was Nash speeding. The record reflects that Nash was traveling 45 mph in a 55 mph speed. Further, *663 there is nothing in the record to indicate that Nash's behavior constituted "reckless disregard for the safety of others," which would violate the duty imposed by LSA-R.S. 32:24 on drivers of emergency vehicles. Nor does the record indicate that Nash acted without due regard for the safety of others. Nash's action in driving the fire pickup truck in the turning lane of Louisiana Highway One was reasonable, particularly since he was entitled to assume that Mr. Rabalais would not move his vehicle until the fire truck had passed. See Smith v. Commercial Union Ins. Co., 609 So.2d 1024 (La.App. 2 Cir.1992).
When we assign responsibility for this collision, it is clear that Mr. Rabalais' actions violated the duty imposed on drivers by LSA-R.S. 32:125[3] to make way for emergency vehicles. Rather than stopping and staying in position until the fire truck had passed, Rabalais' testimony indicated that he never looked to his left, that he looked only to his right, and then moved forward into the roadway. He was negligent in failing to look left, to see what he should have seen, and hear the approaching fire trucks; negligent in failing to yield the right of way, and failing to stop and remain in position until the authorized emergency vehicle had passed. The phrase "direction of movement" implies any process that involves movement on a particular course or in a particular direction. As such, the phrase "direction of movement" could include both an emergency vehicle traveling down the wrong way of a one-way street, and an emergency vehicle traveling down the center lane of a two-way highway.
Subsection C of LSA-R.S. 32:24 states that "the exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of audible or visual signals sufficient to warn motorists of their approach, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle." Subsection C, then, makes applicable the privileges under subsection B only when the emergency vehicle is making use of audible or visual signals sufficient to warn motorists of their approach.[4]
Here, the record reflects there were six witnesses to the accident. Gretchen Laborde, Lee Bordelon, Mark Bordelon (firemen), Lloyd Nash (defendant), and Carl James Ducote, all testified that the emergency lights on the fire pickup truck were activated. (R. 747, 752, 792-793, 826, 839, and 894). In addition, Earl Guillory (defendant), testified that he heard the sirens from the fire trucks. (R. 900-902).
At trial, Mr. Rabalais attempted to establish that Captain Nash did not in fact activate the fire truck's sirens and/or flashing lights. The jury evidently believed *664 Nash and the independent witnesses on this point and their finding was reasonable, based on the record before us.
When the driver of an emergency vehicle meets the requirements of LSA-R.S. 32:24, the driver can only be held liable for actions which constitute reckless disregard for the safety of others, i.e., gross negligence. Neloms v. Empire & Marine Ins. Co. (La.App.2 Cir.10/16/03), 859 So.2d 225. If the emergency vehicle driver's conduct does not meet the requirements of LSA-R.S. 32:24, the driver's actions will be gauged by an ordinary standard of "due care." Lenard v. Dilley, 01-1522 (La.1/15/02), 805 So.2d 175; See also Pope v. Prunty, 37,395 (La.App.2 Cir.8/20/03), 852 So.2d 1213, where the court determined that LSA-R.S. 32:24(C) requires an emergency vehicle driver(ambulance), to use lights and/or sirens "sufficient to warn motorists of their approach." The trial judge concluded that the use of warning lights alone was insufficient. Since the driver's actions did not follow LSA-R.S. 32:24; the court measured her actions by an ordinary standard of due care.
Subsection D of LSA-R.S. 32:24, sets out two standards of care for an emergency vehicle driver depending on the circumstances of the case. When an emergency vehicle driver's actions fit into subsections A, B and C of LSA-R.S. 32:24, the emergency vehicle driver will be held liable only for actions which constitute reckless disregard for the safety of others.[5] On the other hand, if the emergency vehicle driver's conduct does not meet the statutory requirements, the driver's actions will be gauged by a standard of "due care."
In Spears v. City of Scott, 05-0230(La. App.3 Cir. 11/2/05), 915 So.2d 983, the appellate court found that the police officer's actions in approaching and then continuing on through the intersection constituted gross negligence and that the officer's siren was insufficient to warn motorists of his immediate approach to the intersection. In Spears, the appellate court noted that Subsection (B)(2) of LSA-R.S. 32:24 allows the driver of an emergency vehicle to proceed past a stop signal, but only after slowing down or stopping "as may be necessary for safe operation." The trial court found that the driver "came to a rolling stop at the intersection, but that he did not continue to monitor traffic when he entered the intersection, even though he was traveling through the intersection against a red light."
Spears can be distinguished from the instant case. In Spears the officer failed to maintain a lookout before he proceeded. Therefore, the immunity provisions of LSA-R.S. 32:24 were inapplicable. In the instant case, Mr. Rabalais failed to maintain a lookout as he proceeded into the roadway.
After careful review of the record in its entirety, and applying the appropriate standard for review, we find the court of appeal erred in reversing the jury's conclusion that defendants Nash, the Marksville Fire Department and their insurer, were not liable.

DECREE
For the foregoing reasons, we reverse the ruling of the court of appeal and reinstate the judgment of the trial court.
*665 REVERSED AND JUDGMENT OF TRIAL COURT REINSTATED.
CALOGERO, C.J., dissents and assigns reasons.
KNOLL, J., dissents and assigns reasons.
WEIMER, J., additionally concurs and assigns reasons.
VICTORY, J., additionally concurs for the reasons assigned by WEIMER, J.
CALOGERO, Chief Justice, Dissenting.
The court of appeal properly construed La.Rev.Stat. 32:24 strictly and concluded that the statute did not authorize the defendant, fire truck driver, to travel in the turning lane. The only "privileges" a driver of an emergency vehicle is entitled to exercise are specifically set forth in La. Rev.Stat. 32:24(B) as follows:
(1) Park or stand, irrespective of the provisions of this Chapter;
(2) Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operation;
(3) Exceed the maximum speed limits so long as he does not endanger life or property;
(4) Disregard regulations governing the direction of movement or turning in specified directions.
Although the majority agrees with the court of appeal's conclusion that the actions of the defendant driver do not fit under subsection 1 through 3 above, it reverses the court of appeal's finding of liability on the part of the driver by finding that his actions fit under subsection 4, which is highlighted above. In order to do so, the majority focuses on the word "movement" in that subsection and uses a definition from an on-line dictionary to support its conclusion. However, it seems apparent to me, as the court of appeal implied, that the more important word in La.Rev.Stat. 32:24(B)(4) is "direction." The subsection is clearly designed to allow the driver of an emergency vehicle to exercise the privilege of going the wrong way on a one-way street and/or to turn in a direction the law otherwise prohibits, such as making a left turn where such turns are normally prohibited.
The defendant driver was not traveling in the wrong direction when the accident occurred in this case. Rather, he was traveling in a center turn lane, that obviously allows travel for a short distance in either direction, but does not allow a driver to travel for greater distances. The defendant driver was not violating any law regarding movement in a given direction at the time of the accident, and therefore his actions are not protected by La.Rev. Stat. 32:24(B)(4).
Therefore, I would not immunize this driver or exonerate him from liability on the strength of the Emergency Vehicle Statute. As a consequence, I would assign some fault to both the plaintiff and defendant in the case, as did the court of appeal.
KNOLL, Justice, dissenting.
In the present case, I find the majority, in contravention of well established rules that strictly construe immunity statutes, extends a governmental immunity to include a vehicle whose use was not necessary to the performance of an emergency function at a time when the period of first response had elapsed. For these reasons and those that follow, I respectfully dissent from the majority opinion.
In determining the proper standard of care LA.REV.STAT. ANN. § 32:24 imposes on the driver of an emergency vehicle, this Court in Lenard v. Dilley, 01-1522 (La.01/15/02), 805 So.2d 175, found that *666 statute contains two alternate standards, depending on the circumstances. If subsections A, B and C of LA.REV.STAT. ANN. § 32:24 are met, an emergency vehicle driver will be held liable only for actions which constitute reckless disregard for the safety of others. On the other hand, if the emergency vehicle driver's conduct does not fit subsections A, B and C of LA.REV. STAT. ANN. § 32:24, such driver's actions will be gauged by an ordinary negligence standard. Lenard, 805 So. 2d at 180.
Simply because an individual happens to be an emergency vehicle driver does not automatically relieve him from liability for ordinary negligence. Lenard, 805 So.2d at 181. As provided in LA.REV.STAT. ANN. § 32:24(A), "The driver of an authorized emergency vehicle when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section,. . . ." (Emphasis added). As a threshold issue, it is well established that the privilege set forth in LA.REV.STAT. ANN. § 32:24 may be invoked only if the driver of the emergency vehicle is responding to an emergency. Keating v. Holston's Ambulance Service, Inc., 546 So.2d 919 (La. App. 3 Cir.1989); Prather v. Gautreaux, 297 So.2d 439 (La.App. 3 Cir.1974). One factor in the determination of whether a particular act of an emergency vehicle driver is privileged is whether the dangerous act was necessary to the performance of the emergency function. Bunkie Funeral Home, Inc. v. McNutt, 414 So.2d 1263 (La.App. 3 Cir.1982).
In the present case, it cannot be denied Captain Lloyd Nash was driving a fire department vehicle and that it was properly using audible or visual signals sufficient to warn motorists of his approach. Nevertheless, my review of the facts convinces me Mr. Nash was not performing an act necessary to the emergency at the time of the accident. The Marksville Fire Department had been fighting the fire at the Jen-Re Plastics Plant for as long as 90 minutes when Mr. Nash was re-dispatched to the fire station. Seven neighboring volunteer fire departments had also responded to the Jen-Re fire and as many as forty-five firefighters were fighting the fire when the Fire Chief directed Mr. Nash to leave the scene of the fire to transport another fireman back to the fire station to retrieve another pumper truck and additional equipment. Although the pumper truck contained air packs, foam, and a large water canon, Mr. Nash's vehicle carried no additional equipment that would have assisted in fighting the fire.[1] Further, no showing was made that it was necessary for Mr. Nash's vehicle to lead the way for the pumper truckthe pumper truck was clearly marked as a fire department vehicle, had the proper lighting, and its siren was operational. Significantly, Mr. Nash admitted in his deposition, there was no purpose for him to lead the pumper truck back to the scene of the fire; he could easily have followed the pumper truck back.
Although the Jen-Re fire was large and it burned for a long time,[2] Mr. Nash's *667 return trip to the fire clearly did not involve the urgency that a first response would have entailed. The Fire Chief had already determined the Jen-Re employees were accounted for and they were not endangered by the fire. Additionally, all of the Marksville firemen were on the scene, except for Mr. Nash and Mr. Bordelon, and the Marksville Fire Department was assisted by a large contingent of firemen from neighboring towns; together they were fighting the fire and protecting neighboring properties. Moreover, Assistant Fire Chief Chris Bordelon stated that at the time of Mr. Nash's accident the fire was contained to the structure and later that day it was determined to let the fire burn everything down at the Jen-Re site.
Against that backdrop, I simply do not see that Mr. Nash's vehicle fits the description of an emergency vehicle responding to an emergency that would be entitled to the privileges set forth in LA.REV.STAT. ANN. § 32:24. It is evident from the language employed in LA.REV.STAT. ANN. § 32:24 that the Legislature was keenly aware of the danger posed to the public as an emergency vehicle responds to an emergency call. As illustrated in the present case, bumper-to-bumper traffic impeded the southbound lane needed to return to the Jen-Re plant, forcing Mr. Nash to utilize the turning lane, a non-traditional thoroughfare, as a means to reach the fire. Likewise, the bumper-to-bumper traffic impeded the view Mr. Rabalais had as he attempted to turn into the northbound lane of travel. When confronted with those facts, the investigating state trooper, Phillip Tagliarino, stated he would not have driven in the turn lane at a speed of 45 m.p.h. The trooper further stated that when other people are already at the scene of an emergency, the need to hurry your response is no longer needed.
Although I disagree with the appellate court's analysis of LA.REV.STAT. ANN. § 32:24, I nonetheless find the appellate court's reliance on ordinary negligence appropriate under the facts of this case. Accordingly, I would affirm the appellate court decision for other reasons.
WEIMER, J., additionally concurring.
I write only to further address whether the facts support the application of LSA-R.S. 32:24 because Captain Nash was "responding to an emergency call" or was "responding to, but not . . . returning from, a fire alarm."[1]
Clearly, Captain Nash was not returning from a fire alarm. Obviously, this portion of the statute addresses the situation which occurs after the fire fighting task is complete and the firefighters are returning to the fire station. There is generally no need for haste in returning to the station and the protections afforded by the statute do not apply.
In this matter, the facts adequately support a finding that Captain Nash was "responding to an emergency call" or he was in the process of "responding to . . . a fire alarm." When he was dispatched to the station to retrieve equipment and while he was returning to the fire scene, the fire was still ablaze and the emergency had not abated. Haste was imperative. Even if it can be suggested Captain Nash was not responding to an emergency call (a suggestion with which I disagree), he remained in the process of responding to a *668 fire alarm at the time of the accident at issue.
Assistant Chief Bordelon ordered Captain Nash and firefighter Bordelon to return to the fire station to retrieve another fire truck, Pumper No. 1. The firefighters needed the additional equipment on Pumper No. 1, including air packs, foam, and a large water cannon. The pumper was capable of spraying 1000 to 2000 gallons of water per minute. It also had the capability to draft water from a nearby pond to fight the fire. Additionally, the pumper was needed at the scene in the event that another fire erupted elsewhere.
Assistant Chief Bordelon advised Captain Nash and firefighter Bordelon to retrieve the pumper and return "as soon as possible." With a fire of this magnitude, Assistant Chief Bordelon indicated that every man counted and even one man could make a difference. The fire burned out of control and remained an emergency to the firefighters whose lives were at stake as they battled the enormous blaze. The plaintiff's own expert admitted this fire created an emergency and acknowledged he would defer to the firefighters concerning their decision as to the appropriate response to the fire.
Captain Nash was not a mere courier. He was the third ranking officer in the department and had 14 years experience. His job at the scene was to assist the fire chief in coordinating the actions of the firefighters. The record adequately establishes Captain Nash was "responding to an emergency call" or "responding to . . . a fire alarm" as contemplated by LSA-R.S. 32:24. At the time of the accident, the fire was still being fought. Firefighters remained at risk as long as they battled the blaze. It was not until later that day that a decision was made to allow the fire to burn itself out.
Firefighters must be afforded sufficient discretion to determine what is an emergency as they risk their lives in an effort to save lives and protect property. The statute at issue was written to limit the circumstances that will result in the imposition of liability on emergency responders. We should not construe what is an emergency or what is a response to a fire alarm so as to render the statute ineffective to achieve the purpose for which it was enacted.
Firefighters are entrusted to serve as special guardians of the public's safety. Their uncontradicted testimony regarding what is considered an emergency or whether they are responding to a fire alarm must be afforded proper deference and should not be second guessed unless unsupported by the facts.
NOTES
[1] Mr. Rabalais filed a supplemental petition for damages, adding Mr. Earl Guillory, his employer, Avoyelles Glass of Bunkie, Inc., and its insurer State Farm Insurance Company. Prior to the trial, on joint motion of Mr. Rabalais and defendants, State Farm Mutual Auto Insurance Company, Avoyelles Glass of Bunkie, Inc., and Mr. Guillory, were dismissed as defendants, leaving Lloyd Nash, the City of Markville Fire Department and American Alternative Insurance Company as defendants.
[2] The court's reliance on Pellegrini v. Crellin, as authority, is misplaced since Pellegrini, involved the Direct Action Statute, LSA-R.S.22:655(B), and involved the issue of whether an injured third party may recover from the insured tortfeasor's automobile insurer. The trial court held that an injured third party did not have a direct cause of action. The Fourth Circuit, held that a third party could not bring a bad faith cause of action for the insurer's failure to settle a claim.
[3] The degree of care required of the driver of other vehicles, upon the approach of an emergency vehicle, is provided for by LSA-R.S. 32:125 which states:

A. Upon the immediate approach of an authorized emergency vehicle making use of audible and visual signals, or of a police vehicle properly and lawfully making use of an audible signal only, the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right hand edge or curb of the highway clear of any intersection, and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.
B. This section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway.'
[4] The statute specifically provides that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.
[5] In Istre, et al. v. Daniel Meche, 05-0303,(La. App. 3 Cir. 11/02/05), 916 So.2d 307, the appellate court held that police officer acted reasonably in joining high-speed pursuit as it moved from rural into city area. But see, Youngblood et al. v. Lee, et al., 40-0314(La. App. 2 Cir. 11/02/05), 914 So.2d 1186, where the court held that the evidence supported the trial court's finding that the police officer acted with reckless disregard for the safety of the public and was liable for the accident.
[1] In my view, the presence of these factors distinguish the pumper truck from Mr. Nash's vehicle. The evidence preponderates that there was an identifiable need to resupply the firemen on the scene with air tanks, foam would later be needed to douse the fire, and the water canon served a usefulness in fighting the fire. These indicia convince me that the pumper truck, had it been involved in the accident, would have met the requisites in LA.REV.STAT. ANN. § 32:24 needed to call the higher standard of negligence into play.
[2] The record does not establish the length of time the fire burned. Mr. Nash stated he was told the fire burned for 10 to 12 hours.
[1] LSA-R.S. 32:24 provides, in pertinent part:

A. The driver of an authorized emergency vehicle, when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated.